IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

TRACI M. GUYNUP,

Plaintiff,

v.

CLARKE COUNTY SHERIFF CHIEF DEPUTY TRAVIS SUMPTION,

Defendant.

Case No. 5:20cv00086

**MEMORANDUM OPINION**

By: Hon. Thomas T. Cullen
United States District Judge

---

When Plaintiff Traci Guynup entered into a business relationship with Carla Giacomangeli, she likely did not expect it to end with police intervention. But after that relationship soured—and Giacomangeli accused Guynup of committing a felony—Defendant Travis Sumption, Chief Deputy of the Clarke County Sheriff's Office, deescalated a situation that might have culminated in Guynup's arrest. And it's safe to say that, for his successful efforts at keeping Guynup out of jail and helping to retrieve her property, Deputy Sumption *really* did not expect Guynup to sue him in federal court. But here we are.

This matter is before the court on Deputy Sumption's motion for summary judgment.[1] The court has reviewed the body-camera footage taken on the night in question, all relevant

[1] Deputy Sumption filed a motion to dismiss or, in the alternative, motion for summary judgment. (ECF No. 33.) By Order dated August 3, 2021, the court informed the parties that it intended to convert Deputy Sumption's motion into one for summary judgment under Federal Rule of Civil Procedure 12(d). (ECF No. 46.)

evidence,[2] the briefs and arguments of the parties, and the applicable law. For the reasons discussed below, the court will grant Deputy Sumption's motion for summary judgment.

## I. STATEMENT OF FACTS

In February 2020, Guynup and Giacomangeli entered into an agreement[3] that permitted Guynup to use Giacomangeli's farm at 105 Bishop Meade Road, farm equipment, and cottage, and the two later entered into an oral agreement for Guynup's use of Giacomangeli's 2006 Lexus. That arrangement apparently worked well until late June 2020, when Giacomangeli ended it. On June 27, 2020, after Guynup failed or refused to return the Lexus, Giacomangeli involved the Clarke County Sheriff's Office. Deputy Sumption was dispatched to Guynup's residence at 405 Hermitage Boulevard to investigate Giacomangeli's complaint.

According to Deputy Sumption's report, prior to arriving at Guynup's residence, Giacomangeli had told him that Guynup was running a "weekly business that provides vegetables and other foods to customers." (ECF No. 34-1.) The week before, Giacomangeli had also given Guynup permission to use the Lexus when weather was bad because Guynup did not have a car and would ride her electric bike to work every day. Giacomangeli told

---

[2] There has been ample evidence submitted by the parties, and the court has reviewed it all. While much of the evidence is not cited in this Opinion, the parties should be assured that all evidence has been given due consideration.

[3] Guynup purportedly filed a copy of the lease with the court (*see* ECF No. 57), but the hyperlink that leads to that lease does not work. In a state-court filing, however, Giacomangeli admitted that Guynup "entered into a contract by and between herself and [Ms.] Giacomangeli and Ali El-Khatib dated June 2, 2020 concerning Guynup's employment to complete certain labor and/or tasks on the property" Giacomangeli owned. (Pl.'s Br. in Opp. to Mot. for Summ. J. Ex. P [ECF No. 37-10].) In any event, Guynup's suit is against Deputy Sumption and is based on his actions. Her deteriorating relationship with Giacomangeli, including Facebook messages and "tirades" that did not include Deputy Sumption (*see* ECF No. 64-1 ¶ 2), are irrelevant to her claims against Deputy Sumption.

Deputy Sumption, however, that Guynup used the Lexus "beyond what Giacomangely [*sic*] gave her permission to use it for," and that Giacomangeli "contacted Guynup by Facebook messenger and told her that the vehicle needed to be returned to her residence by [3:00 p.m.] on June 27, 2020." (*Id.*)

"While waiting on Guynup to return the car," Giacomangeli and others packed up some of Guynup's things and took them to her residence. According to Guynup, her items were "dumped . . . on the curb" outside her home. (Am. Compl. ¶ 73 [ECF No. 26].) Giacomangeli told Deputy Sumption that, while she was at Guynup's "placing the belongings in the front yard," she saw Guynup driving the vehicle, but, when Guynup saw Giacomangeli, Guynup "turned around and left the area." (ECF No. 34-1.) Deputy Sumption inquired whether Giacomangeli wished to file charges against Guynup for unauthorized use, *see* Va. Code Ann. § 18.2-102, and Giacomangeli told him that "she had no other choice." (*Id.*)

With that background, Deputy Sumption went to Guynup's home to inquire about the Lexus. His subsequent interactions with Guynup were recorded on Officer Voorhees's body-worn camera ("BWC"), who Deputy Sumption requested respond to Guynup's home because he had a BWC. (*See* ECF No. 34-1.)

The BWC footage[4] documents Deputy Sumption's interactions with Guynup. When Officer Voorhees arrived, Deputy Sumption was already speaking with Guynup. He explained

[4] There are three BWC clips. (*See* Def.'s Br. in Supp. of Mot. for Summ. J. Ex. B, Apr. 15, 2021 [ECF No. 34-2].) The first is from Officer Voorhees, documents the first conversation between Guynup and Deputy Sumption, and runs approximately 7 minutes and 25 seconds. The second clip, also from Officer Voorhees and which runs 6 minutes and 18 seconds, shows the conversation between Deputy Sumption and Guynup when Deputy Sumption offered to take Guynup to pick up her bike and to drive her and her bike back to her house so that Guynup would not have to ride her bike home in the dark. The third clip, which runs 49 minutes and 8 seconds, shows all of Deputy Sumption's actions after he left Guynup's house following their second

that Giacomangeli wanted the car back. Deputy Sumption advised Guynup that Giacomangeli said she had "terminated" the agreement about using the Lexus and that Guynup was supposed to have the car back by that afternoon. Guynup said she "never worked for" Giacomangeli, but Deputy Sumption told her that "didn't matter." Guynup responded that there was a "contract," and that the car was part of that contract. When Deputy Sumption asked where the car was, Guynup replied: "She owes me a bunch of money." As it turns out, Guynup had parked the Lexus some distance away from her residence in an apparent attempt to exert leverage over Giacomangeli in their dispute.

Deputy Sumption told Guynup about the possible felony unauthorized use charge and explained that they had two options to deal with the situation: (1) he could arrest her on the unauthorized use charge; or (2) she could tell him where the car is, he could call Giacomangeli and have her pick up the car and drop off Guynup's bike, and they could all "be done with this." Guynup responded, "She's gonna bring the bike?" Deputy Sumption said he didn't know, but that Guynup needed to tell him where the car was before he could call her. Guynup then asked if she could report the bike as stolen; Deputy Sumption told her she could not because she knew where the bike was.[5] Apparently frustrated by her refusal to cooperate, Deputy Sumption told Guynup he was going to give her "one more chance" to tell him where the car was. Guynup replied that she would get the keys. Deputy Sumption asked where the

conversation (recorded in the second clip) until he dropped her back off at her house at the end of the evening. (It appears that, for the third clip, Deputy Sumption took Officer Voorhees's BWC.)

[5] Guynup told Deputy Sumption that she left the bike at the farm. It is unlawful "to knowingly give a false report as to the commission of any crime to any law-enforcement official with intent to mislead . . . ." Va. Code Ann. § 18.2-461.

keys were, and Guynup said that they were in her house. She then told Deputy Sumption he could "walk around with [her]."

When they approached her apartment,[6] Guynup walked in while asking Deputy Sumption about her "stuff," and left the door open behind her. Deputy Sumption and Officer Voorhees followed her in, with Deputy Sumption continuing the conversation that Guynup initiated as they walked into her apartment. Deputy Sumption told her they would discuss her belongings once they got the car back. Guynup handed Deputy Sumption the keys and Deputy Sumption asked: "Where's the car at?" Rather than answering his question, she responded that she wanted "to get [her] stuff back." She told Deputy Sumption she had given him the keys, but Deputy Sumption explained that the key is no good to him unless he knew where she had parked the car. Guynup paused and said, "I'm not stealing it anymore."

Deputy Sumption repeatedly asked Guynup to tell him where the car was, but she refused. Instead, she complained that Giacomangeli had dumped Guynup's "shit" in the front yard and that some of her belongings were still at Giacomangeli's farm. Deputy Sumption explained that getting her possessions back from Giacomangeli was a civil matter, but that the issue with the car was a criminal one. Eventually, Guynup told Deputy Sumption that she would tell him where the car was, but she wanted Deputy Sumption to tell her that she would get her things back. Deputy Sumption explained that he could not promise that, but he offered to "look at that after [he knew] where the car [was]." Guynup responded: "I don't trust you." She then picked up her phone and said: "Ok, I'm going to get you on video saying that you'll help me get my stuff back." Deputy Sumption responded: "I said we'll look into it." After

[6] Guynup apparently lived in a basement apartment at 405 Hermitage Boulevard.

further back and forth, Deputy Sumption stated that, if Guynup would take him to where the car was, he would call Giacomangeli and see if she could bring Guynup her belongings. Finally, Guynup divulged the car's location. When he left, Deputy Sumption told Guynup "don't leave from here" because he intended to return and discuss the issue of her personal belongings with her. At no point during the conversation did Deputy Sumption leave Guynup's presence or look through her apartment or personal effects.

Deputy Sumption located the car and called Giacomangeli, who arrived to take possession of it. Deputy Sumption asked Giacomangeli if she still wanted to press charges, but she declined. Deputy Sumption then inquired if Guynup could go out to the farm to retrieve her bike; Giacomangeli "advised that would be fine." (ECF No. 34-1.)

Deputy Sumption then returned to Guynup's residence.[7] He advised Guynup that Giacomangeli had said that she could return to the farm to pick up her bike and offered to drive her there. Guynup accepted Deputy Sumption's offer for a ride, and then walked back to her apartment. After a few minutes, Deputy Sumption went around to Guynup's door and told her that he would retrieve the department's pickup truck, take her to Giacomangeli's farm to pick up the bike, and bring Guynup and the bike back because he did not want her riding home in the dark. Guynup agreed, and Deputy Sumption left.

A short time later, Deputy Sumption returned with a trailer attached to his vehicle.[8] Deputy Sumption picked Guynup up and drove her to the farm. Once there, he accompanied

[7] The second BWC clip documents this encounter.

[8] The third BWC clip, which Deputy Sumption started as soon as he departed Guynup's house after the second encounter, documents everything he did, from the time he left Guynup's home the second time until he dropped Guynup off at home with her bike.

her inside a barn for a few seconds while she located her bike, then Deputy Sumption loaded and secured her bike in the trailer. He then drove her home without incident. They spoke cordially to each other during the ride, discussing common acquaintances and where they both attended church. The two had no other interactions.

For his efforts on June 27, 2020, Guynup sued Deputy Sumption in this court on November 24, 2020.[9] (Compl. [ECF No. 1].) She alleges various violations of her right to be free from unreasonable searches and seizures as well as her right to due process. She also accuses Deputy Sumption of excessive force and false arrest. (*See generally* Am. Compl. ¶¶ 212–327 [ECF No. 26].) On April 15, Deputy Sumption filed a motion to dismiss or, in the alternative, motion for summary judgment. (ECF No. 33.) On August 3, the court advised the parties that it intended to convert Deputy Sumption's motion to one for summary judgment, and expressly informed the parties that evidence could be submitted in support of or in opposition to the motion. (*See* Order, Aug. 3, 2021 [ECF No. 46].) Guynup subsequently filed evidence in opposition to the motion, a motion to "quash" Deputy Sumption's motion (which the court construes as an additional brief in opposition), a motion to amend her complaint to add three new causes of action, a motion to compel/motion to show cause, and two motions to exclude evidence. On August 25, 2021, the court held a hearing on the motion for summary judgment. At the outset of that hearing, the court reiterated its intent to convert Defendant's motion to dismiss into a motion for summary judgment and listed the various materials that had been submitted by both parties, and reviewed by the court, prior to the hearing. After the

---

[9] Guynup's original complaint also named Clarke County, Virginia, as a defendant. Her amended complaint, which was filed on March 24, 2021, only named Deputy Sumption and did not include Clarke County. (*See* Am. Compl. [ECF No. 26].)

hearing, Guynup filed an affidavit in opposition to Deputy Sumption's motion and another request to amend her complaint to add one more cause of action.

## II. STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v.*

*Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## III. MOTION FOR SUMMARY JUDGMENT

Despite the wealth of evidence supplied by the parties, this case can be decided on the basis of the footage recorded on Officer Voorhees's BWC. Because the BWC captured everything that occurred between Guynup and Deputy Sumption, the court is not obliged to give deference to her factual assertions that are belied by clear video evidence. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (noting that when a video "quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

Turning to the allegations in her Amended Complaint, Guynup attempts to make eight distinct causes of action; on review, however, it is apparent that many of her grievances overlap. Accordingly, the court will address each count based primarily on its heading.

**A. <u>Count 1: "Unreasonable Search for Plaintiff"</u>**

In this count, Guynup alleges that Deputy Sumption "searched 105 Bishop Meade Road without probable cause and without Guynup (lessee's) permission"; and that Deputy Sumption "searched 405 Hermitage Boulevard [Guynup's home] without probable cause and without Guynup's permission."

As to the "search" of 105 Bishop Meade Road, Giacomangeli's farm, the BWC footage confirms that a search of that property never occurred. While Guynup alleges one did, on summary judgment, she cannot merely rely on her allegations to defeat the motion. Moreover, as she was not present at 105 Bishop Meade Road when Deputy Sumption was there, she has no personal knowledge of whether a "search" actually occurred, and Guynup has not presented any evidence to establish a genuine issue of material fact in support of her allegation.[10]

Insofar as Guynup claims that Deputy Sumption later "searched" the barn at the farm when he drove her there to retrieve her bike, her claim is undermined by the BWC footage. Even assuming that one could characterize his mere presence inside the barn for a few seconds as a "search," it is clear that Deputy Sumption's presence was consensual. *See Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (noting that "consent" is "one 'jealously and carefully

[10] All of this assumes that Guynup even has standing to challenge the search of a farm that she did not own.

drawn' exception" to the Fourth Amendment's warrant requirement) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)).

Regarding the alleged search of 405 Hermitage Boulevard, where Guynup was renting a basement apartment, the BWC footage establishes that a search did not occur. Generally speaking, a "search" occurs for Fourth Amendment purposes "when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). It is well-settled that police do not conduct a "search" when they approach a home and attempt to speak with its residents. *Accord Florida v. Jardines*, 569 U.S. 1, 8 (2013); *Beard v. Alexandria*, 341 U.S. 622, 626 (1951) ("[T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds."). Likewise, that invitation extends to wherever the owner may reasonably be found. *See, e.g.*, *United States v. Jones*, No. 4:13cr00011-003, 2013 WL 4678229, at *6 (W.D. Va. Aug. 30, 2013). Accordingly, when Deputy Sumption approached 405 Hermitage Boulevard and spoke with Guynup, a search did not occur.

Moreover, Guynup consented—albeit implicitly—to Deputy Sumption's presence in her apartment. Based on the BWC video, there is no reasonable dispute that Guynup opened the door to Deputy Sumption and made no objection to his following her into her living room. In fact, she *initiated* a conversation while stepping over the threshold and into her apartment. Once inside, she engaged him in conversation and implored him to assist her in retrieving her

"property." Because Deputy Sumption's action did not "violate" Guynup's reasonable expectations of privacy, a search of her home did not occur.[11]

### B. Count 2: "Unreasonable Search of 405 Hermitage Boulevard"

Guynup reiterates the claim made in Count 1 that the search of Hermitage Boulevard violated her Fourth Amendment rights to be "secure in her person . . . ." Insofar as she reiterates her claim that a search of Hermitage Boulevard occurred, for the reasons given above, her argument finds no support in the law or the evidence.

Guynup also states in Count 2 that Deputy Sumption "deprived the Plaintiff of her Fourth Amendment right to be free from unreasonable seizures." Generally speaking, a seizure under the Fourth Amendment "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Here, there was no physical force or assertion of authority. Although Deputy Sumption spoke—at times, harshly—to Guynup, at no point did he require her movement or acquiescence in any way, nor was her freedom to move or terminate the encounter limited. The video evidence confirms that Guynup was never seized under the Fourth Amendment.

But assuming that a seizure of her person *did* occur, it was clearly justified. Deputy Sumption had received a complaint that Guynup had committed felony unauthorized use of a vehicle, *see* Va. Code Ann. § 18.2-102, and thus had reasonable suspicion for a brief,

---

[11] In her complaint, Guynup alleges that Deputy Sumption "did not know the owner of 405 Hermitage Boulevard." Given that Deputy Sumption had information listing 405 Hermitage Boulevard as Guynup's address, Guynup's presence there, and her access to the home, Deputy Sumption was justified in relying on her "apparent authority" to consent to his brief presence in the home. *See Illinois v. Rodriguez*, 497 U.S. 177, 187–88 (1990).

investigatory detention of her. *See Reid v. Georgia*, 448 U.S. 438, 440 (1980). In assessing reasonable suspicion, courts "view the totality of the circumstances to determine whether the officer had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). Here, Deputy Sumption was aware that Giacomangeli had accused Guynup of unauthorized use of the Lexus. And Guynup admitted that she had possession of the vehicle in question. At that point, not only did Deputy Sumption have reasonable suspicion to justify Guynup's detention, but he also had probable cause to arrest her.[12] Therefore, no Fourth Amendment violation occurred.

Guynup also alleges that Deputy Sumption "arrested" her "by telling her that she must stay in her basement apartment." (Am. Compl. ¶ 325.) This interpretation of her interaction with Deputy Sumption is plainly unreasonable, and no reasonable juror could accept it. *See, e.g.*, *Ballengee v. CBS Broad., Inc.*, 331 F. Supp. 3d 533, 551–52 (S.D.W. Va. 2018) (granting summary judgment because "no reasonable juror" could find that a broadcast contained the implication the nonmovant claimed). Deputy Sumption told her to stay at home so that he could come back and pick her up *to do her a favor*. He did not arrest her.

[12] Guynup counters that Deputy Sumption failed to investigate the charge and that, if he had, he would have known she had not committed a crime. But Deputy Sumption was not obliged to do anything more than he did. "[P]olice officers need not exclude every suggestion that a victim is not telling the truth. Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established. Consequently, the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage. . . . The credibility of a putative victim or witness is a question, not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial." *Crouch v. City of Hyattsville*, No. DKC 09-2554, 2012 WL 6019296, at *6 (D. Md. Nov. 30, 2012).

### C. Count 3: "Unreasonable Search, Seizure and Warrantless Detention of Plaintiff, June 27, 2020"

As stated above, no search or seizure occurred of Guynup or her home. Insofar as any search and/or seizure did occur, they were proper.

In this count, Guynup adds that "Deputy Sumption lacked probable cause to seize the plaintiff's key to the 2006 Lexus"; "Deputy Sumption lacked probable cause to seize and search the 2006 Lexus"; and "Deputy Sumption lacked probable cause to seize Guynup's real and personal property at 105 Bishop Meade Road."

Regarding the key, the BWC footage confirms that Guynup willingly surrendered this property (insofar as it was even hers such that she could assert a possessory interest in it). In fact, she bargained for Deputy Sumption to assist her in retrieving her personal property in exchange for her cooperation. This evidence flatly contradicts Guynup's allegations.

Regarding the "search and seizure" of the 2006 Lexus, there is no evidence that a search of the car occurred. The seizure, insofar as there was one, was consensual when Guynup voluntarily surrendered the keys to Giacomangeli's car.

And finally, there is no evidence that a search or seizure ever occurred at 105 Bishop Meade Road. To the extent a search did occur when Deputy Sumption took Guynup to pick up her bike, his brief presence inside the barn was consensual. Regarding Guynup's claim that Deputy Sumption "seized" her bicycle, it is clear Guynup permitted him to assist her in securing her bike to his trailer. Her consent makes any claim of an unlawful seizure untenable.

**D. <u>Count 4: "Unreasonable Search and Seizure of 105 Bishop Meade Road, Cottage, Barn, Bicycle, $15,000 in personal property, $25,000 of perishable produce"</u>**

Guynup appears to claim that, by "arresting" her on June 27, 2020, Deputy Sumption is responsible for Giacomangeli's alleged destruction of her personal property and perishable produce. (Elsewhere in her complaint, she refers to this entire incident as a "constructive eviction.") Aside from the fact that Guynup was not arrested and clearly consented to her interactions with Deputy Sumption (including riding in his car to pick up her bike), her claim is not supported by law.[13] Deputy Sumption took no action with regard to her personal belongings or perishable products, and thus he has no responsibility for whatever Giacomangeli may have done with them.

**E. <u>Count 5: "Unreasonable Search and Seizure of Vehicle (June 27, 2020)"</u>**

Again, Guynup contends the search and seizure of the Lexus violated her Fourth Amendment rights. As stated above, any seizure of the car that arguably occurred was consensual, and there is no basis in the evidence to conclude that a search was performed on the Lexus—or that, if there was, that Guynup has standing to challenge it. *Cf. United States v. Avagyan*, 164 F. Supp. 3d 864, 876 n.19 (E.D. Va. 2016) (noting that, if an occupant of a car

---

[13] Although she has not shown any violation of her constitutional rights, she also does not allege that Deputy Sumption conspired with Giacomangeli to deprive her of her constitutional rights. *See* 42 U.S.C. §§ 1983, 1985(3); *see also Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996) ("To establish a civil conspiracy under § 1983, Appellants must present evidence that the Appellees acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Appellants' deprivations of a constitutional right . . . ."); *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985) (noting that the elements of a § 1985 claim are "(1) conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with conspiracy").

does not have the owner's permission to occupy the vehicle, she lacks standing to challenge a search of that car).

**F. Count 6: "Violation of Due Process"**

Guynup alleges that Deputy Sumption violated her due process rights by harassing and bullying her, interfering with her property rights, depriving her of a source of income for three years, depriving her of a source of food for three years, depriving her of her private property, and depriving her of real property. For all the reasons discussed above, any deprivations *by Deputy Sumption* were consensual or otherwise lawful under the circumstances. Moreover, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [those] claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Because all Guynup's claims concern alleged Fourth Amendment violations, her "substantive due-process claim cannot proceed as it is 'merely duplicative of claims explicitly protected under other constitutional sources.'" *Carter v. Fleming*, No. 7:16cv00123, 2017 WL 1024342, at *2 (W.D. Va. Mar. 15, 2017) (quoting *Roman v. Velleca*, No. 11-CV-186, 2012 WL 4445475, at *10 (D. Conn. Sept. 25, 2012)), *rev'd on other grounds*, 879 F.3d 132 (4th Cir. 2018).

**G. Count 7: "Excessive Force"**

Guynup claims Deputy Sumption used excessive force when he "threaten[ed] to arrest her for a Felony." (Am. Compl. ¶ 315.) "Verbal harassment and abuse by arresting officers, without more, does not rise to the level of a constitutional claim under § 1983." *Shanklin v. Seals*, No. 3:07cv319, 2010 WL 1225741, at *14 (E.D. Va. Mar. 26, 2010). Like in *Amey v.*

*Pisarek*, a case from the Eastern District of Virginia, Guynup "alleges no use of force against [her] by [Deputy Sumption], much less, excessive force." No. 3:14CV74-HEH, 2015 WL 4418564, at *5 (E.D. Va. July 17, 2015). Because Deputy Sumption did not use any force, Guynup's claim of excessive force cannot succeed.

**H. Count 8: "False Arrests"**

In her final count, Guynup reasserts that Deputy Sumption "arrested" her on June 27, 2020. "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that [s]he was not at liberty to ignore the police presence and go about [her] business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (cleaned up). The BWC footage establishes that Guynup was never detained, seized, or arrested by Deputy Sumption on July 27, 2020; her encounters with Deputy Sumption were all consensual. And even if she was arrested, Deputy Sumption had probable cause to arrest her for unauthorized use. *See Street v. Surdyka*, 492 F.2d 368, 372–73 (4th Cir. 1974) ("[T]here is no cause of action for false arrest under section 1983 unless the arresting officer lacked probable cause."). Her claim for false arrest must fail.

## IV. MOTIONS TO AMEND THE COMPLAINT

Guynup has also filed second and third motions to amend her complaint.[14] (ECF Nos. 52, 65.) Under Federal Rule of Civil Procedure 15(a)(1), a party "may amend its pleading once as a matter of course" within 21 days after serving it or within 21 days after service of a

[14] The court construed a prior filing as her first motion for leave to amend. (*See* Oral Order, Mar. 25, 2021 [ECF No. 28].)

responsive pleading. "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Although "[t]he court should freely give leave when justice so requires," leave should not be granted when the proposed amendment would be futile. Fed. R. Civ. P. 15(a)(2); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

Guynup's second motion to amend seeks to add three additional claims: defamation *per se*, "double jeopardy," and "witness against herself." (Presumably, the last two counts are asserted under 42 U.S.C. § 1983.) Regardless, neither constitutional right has been implicated. Because Guynup was never arrested or charged with a crime, she never faced double jeopardy nor was she compelled to be a witness against herself. Both claims are futile and leave to amend must be denied.

Guynup claims that Deputy Sumption defamed her when he "falsely" accused her of grand larceny. But the BWC footage establishes that Deputy Sumption never said any such thing. He told her they were "looking at" unauthorized use, not grand larceny. When the video evidence "quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable juror could believe it, a court should not adopt that version of the facts . . . ." *Scott*, 550 U.S. at 378. Because Guynup's allegations are flatly refuted by evidence that cannot be questioned, her proposed defamation *per se* claim is futile.

In her third motion to amend, Guynup asks to add a claim of "practicing without authority." In support of this "claim," she cites Virginia Code Annotated § 54.1-3904, which sets for the punishment for practicing law without a license. That statute, however, does not create an independent civil cause of action. Accordingly, leave to amend will be denied.

## V. CONCLUSION

Finding no basis in the law or the facts for any of Guynup's claims, the court will grant Deputy Sumption's motion for summary judgment (ECF No. 33). Because all of Guynup's proposed amendments would be futile, her two motions to amend will be denied. All other pending motions will be denied as moot.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 23rd day of September, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE